RECEIVED

DEC 2 4 2008

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE-OPELOUSAS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION NO. 06-60006 |
| VERSUS | JUDGE MELANÇON |
| MEHMOOD M. PATEL | MAGISTRATE JUDGE METHVIN |

## MEMORANDUM RULING

Before the Court are defendant's Motion to Transfer Venue [Rec. Doc. 166], Supplemental Motion to Transfer Venue [Rec. Doc. 169], Second Supplemental Motion to Change Venue [Rec. Doc. 170], Third Supplemental Motion to Change Venue [Rec. Doc. 175], the government's Opposition thereto [Rec. Doc. 177]; and defendant's Response to the government's Opposition [Rec. Doc. 178], all filed under seal pursuant to the Court's instructions. For oral reasons assigned at the September 30, 2008 hearing, as supplemented by the reasons that follow, defendant's Motion to Change Venue [Rec. Doc. 166] as supplemented [Rec. Docs. 169, and 175] was **DENIED**.

## I. PROCEDURAL HISTORY

On February 15, 2006, the defendant, Dr. Mehmood M. Patel ("defendant" or "Patel"), was indicted on ninety-four counts of Health Care Fraud in violation of 18 U.S.C. §1347 and one count of Criminal Forfeiture pursuant to 18 U.S.C. §982(a)(7). At the time of the indictment, Patel was the subject of local media attention stemming from both the criminal charges and the related civil actions. *See Exhibits 1-19 to Defendant's Motion for Expanded Voir Dire,* [Rec. Doc. 53] and *Exhibit A to*

*Defendant's Motion to Transfer Venue* [Rec. Doc. 166]. Due to concern related to the media coverage in the wake of defendant's indictment and, most importantly, as it was estimated at the time by the attorneys that the trial would last six to seven weeks, the Court was the first to broach the possibility of an intradistrict transfer should it be determined that the effect of the pretrial publicity would prevent the defendant from receiving a fair trial in the Lafayette-Opelousas Division of the Western District of Louisiana.

To that end, the Court initially instituted a deadline of July 27, 2006 for the defendant to seek a change of venue on the basis of pre-trial publicity. Upon the defendant's request, that deadline was extended to August 25, 2006. On August 24, 2006, the defendant filed a Notice Regarding Transfer of Venue Issue [Rec. Doc. 29] wherein counsel noted their belief that ". . . it may very well be difficult to select a fair and impartial jury for this case in Lafayette." However, due to Patel's "strong desire to be tried in Lafayette," counsel informed the Court that it would not seek a change of venue but, instead, would file a " . . . motion for extended voir dire in order to flesh out possible prejudice resulting from pre-trial publicity" and reserved the right to file a motion to transfer venue should "developments during jury selection warrant it."

On December 5, 2006, upon motion of the defendant [Rec. Doc. 37], the Court continued the March 19, 2007 trial date and all pre-trial deadlines due to the complexity of the issues presented. *Order* [Rec. Doc. 38]. Again, despite the defendant's previous declaration, the Court allowed Patel additional time to

2

determine whether the pre-trial publicity warranted a motion to change venue, and, again, on August 27, 2007, Patel filed a notice restating his strong desire to be tried in Lafayette despite the pre-trial publicity, but reserved the right to file a motion for expanded voir dire and motion to transfer venue should the facts warrant it. *Second Notice Regarding Transfer of Venue Issue* [Rec. Doc. 51]. In accordance with his stated intention, defendant filed a Motion for Expanded Voir Dire [Rec. Doc. 53] on August 27, 2007. In its Response to defendant's Motion [Rec. Doc. 56], the government informed the Court that it had no objection to the requested relief, and, on September 14, 2007, the Court granted defendant's motion. *Order* [Rec. Doc. 57].

Prior to the commencement of jury selection, the Court afforded counsel for both the government and the defendant to submit additional "general" voir dire questions to be asked to the venire. Counsel for the defendant submitted several questions regarding pre-trial publicity, general knowledge of the case, independent medical knowledge, and other issues. On August 25, 2008, when the jury selection first commenced, every question submitted by counsel was asked of the venire. After the completion of the "general" voir dire, the Court afforded the attorneys the opportunity to ask questions of the venire and then allowed the attorneys to question prospective jurors individually outside the presence of the venire. The overwhelming majority of the venire was, in fact, individually questioned further.

After two days of questioning, including one day that concluded at 10:30 p.m.,

3

the Court determined that it had reached the "magic number" of qualified veniremen to select a jury.[1] However, before it could allow the parties to exercise their allowed peremptory challenges, a front page newspaper article which appeared in the Lafayette *Daily Advertiser* regarding the settlement by Patel's medical malpractice insurer of certain civil claims against him was brought to the Court's attention. Fearing that some of the qualified veniremen may have read and possibly been influenced by the article, the Court, again, individually questioned each of the panel members from whom the jury and four alternates was to be seated. As a result of this re-interview, several of the qualified members of the venire were excused. Importantly, however, only one was excused due to exposure to the article which prompted the process. The others were excused for issues in no way related to media coverage or bias. At this juncture, there was an insufficient number of veniremen from which to seat a jury and four alternates.

The Court suggested several options to remedy the situation that it, admittedly, caused by releasing the remaining venire.[2] Counsel for the defendant moved for a mistrial or, alternatively, for dismissal of the current jury panel and a stay of proceedings pursuant to 28 U.S.C. §1867 [Rec. Doc. 156]. Before the Court could

---

[1]    The "magic number," 36, was determined by considering the need for 12 jurors, the Court's desire to have 4 alternates, and the parties' collective 20 peremptory challenges afforded by the Federal Rules of Criminal Procedure.

[2]    The Court notes that neither the government nor the defendant objected to the release of the remaining venire once the "magic number" was reached. However, as the judge is the proverbial "Captain of the Ship," it was ultimately the Court's responsibility and its error to release the remaining jury venire prior to the seating of the jury and selection of alternate jurors.

properly consider defendant's motion, Hurricane Gustav came ashore striking many of the parishes of the Lafayette-Opelousas Division of the Western District of Louisiana. After consultation with the attorneys for the parties and agreeing that it was appropriate under the circumstances, the Court released all qualified jurors from the original panel due to the hurricane's effects and denied defendant's motion as moot without objection. *Order* [Rec. Doc. 159].

The Court summonsed a new venire to begin jury selection on Monday, September 15, 2008. Unfortunately, as of September 11, 2008, Hurricane Ike was forecast to also strike the Lafayette-Opelousas Division. Out of an abundance of caution and, again, upon consultation and agreement of counsel, the Court reset the commencement of jury selection for Wednesday, September 17, 2008. *Minutes of Court* [Rec. Doc. 163]. As planned, the second jury selection commenced on September 17.

In this second jury selection, the Court again asked not only its standard "general" voir dire questions, but also the questions previously requested to be asked by the defendant. With this panel, the Court agreed to individually question *every* potential juror regardless of their responses to the "general" voir dire questions. As in the initial proceeding, the attorneys were also afforded the opportunity to question the venire and to question each prospective juror individually. After seven full days of individual voir dire, 42 potential jurors were qualified – two

5

more than the number required to seat twelve jurors and six alternates.[3]

More than a sufficient number of veniremen were qualified to select the jury and six alternates; however, defendant, pursuant to the right reserved in both of his previous notices [Rec. Docs. 29 & 51], filed a Motion to Transfer Venue [Rec. Doc. 166] and supplemented this motion as the *voir dire* continued each day. Upon instruction of the Court and acquiescence of defense counsel, defendant's initial motion was filed under seal with the Clerk of Court. Upon filing each of his subsequent supplemental motions for transfer, counsel for defendant objected to the filing of them under seal.[4] The government opposed defendant's motion and argued that the extensive voir dire allowed by the Court would ferret out any possible prejudice in the jury pool.

## II. LAW AND ANALYSIS

Patel sought a transfer of venue to a different division within the Western District of Louisiana. This request was premised on Federal Rule of Criminal Procedure 18. That rule provides that:

> Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed. The court must set the place of trial within the district with due regard

---

[3]      Initially, the Court intended to seat only 4 alternates. However, after due consideration and out of an abundance of caution given not only the concerns expressed by the defendant but also the sheer length of the trial, the Court found it appropriate to seat an additional 2 alternates.

[4]      While objecting to the filing under seal, counsel for the defendant readily conceded that his client suffered no prejudice as a result thereof but knew of no authority for the Court to enter such an order.

> for the convenience of the defendant and the witnesses, and the
> prompt administration of justice.
> Fed. R. Cr. Pro. 18.

While the relief sought by the defendant is not specifically spelled out in the text of

the rule, the United States Fifth Circuit Court of Appeal has held that an intra-district

transfer is an available option clearly contemplated by the 1966 amendments to the

rule. *United States v. Malmay*, 671 F.2d 869, 876 (5th Cir. 1982).[5]

District courts are vested with "substantial discretion" to grant or deny a

defendant's motion to transfer venue. *United States v .Parker*, 877 F.2d 327, 330

(5th Cir. 1989) (*citing United States v. Noland*, 495 F.2d 529 (5th Cir.), *cert. denied*,

419 U.S. 966 (1974)). However, to assist in determining whether a transfer is

warranted, some courts, including the Fifth Circuit, have found the requirements of

Federal Rule of Criminal Procedure 21 illuminative. *See United States v. Lipscomb*,

299 F.3d 303, 345 (5th Cir. 2002) (*citing United States v. Walker*, 890 F.Supp. 954,

958 n. 5 (D. Kan. 1995) (collecting authorities)). Under Rule 21(a), "[u]pon the

defendant's motion, the court must transfer the proceeding against that defendant

to another district if the court is satisfied that so great a prejudice against the

defendant exists in the transferring district that the defendant cannot obtain a fair

and impartial trial there." Fed. R. Cr. Pro. 21(a). A transfer, then, is *required* only

upon a strong showing of prejudice to the defendant if venue is not changed. *United*

---

5     The Advisory Committee Notes to the 1966 Amendments state, in pertinent part, "If the
      court is satisfied that there exists in the place fixed for trial prejudice against the
      defendant so great as to render the trial unfair, the court may, of course, fix another place
      of trial within the district (if there be such) where such prejudice does not exist."

*States v. Duncan*, 919 F.2d 981, 985 (5th Cir. 1990), *citing United States v. Dickie*, 775 F.2d 607, 609 (5th Cir. 1985), *and Malmay*, 671 F.2d at 876.

In this case, defendant maintained that publicity, "word of mouth" discussions, and the general sentiment of the community regarding the criminal trial and pending civil actions against him had "so saturated the community jury pool as to render it virtually impossible to obtain an impartial jury." *Defendant's Motion to Transfer Venue* [Rec. Doc. 166], pg. 4 (*citing United States v. Smith-Bowman*, 76 F.3d 634, 637 (*quoting Parker*, 877 F.2d at 330)). In support of this proposition, defendant argued that slightly more than 68% of the jurors stated that they had some level of awareness of this case and that roughly 28% of the prospective jurors indicated that they had already formed an opinion concerning the guilt or innocence.[6] Further, Patel cited media coverage from 2004 until present and other statistical information which he maintained proved the community to be so "deeply hostile" to him that it was virtually impossible for him to be afforded a fair trial.

To necessitate a transfer, the publicity and sentiment surrounding the criminal and civil aspects of this case must have been so ". . . ubiquitous and inflammatory" that it ". . . resulted in pervasive community prejudice against [the defendant.]" *Defendant's Motion to Transfer Venue* [Rec. Doc. 166], pgs. 3-4. However, "[i]t is

---

[6] At oral argument, counsel for the defendant suggested that was it "naive" and "Pollyanna" to suggest that any of those 28 jurors formed an opinion of innocence in this case. However, the extensive voir dire in this case revealed that at least some of those who indicated that they had formed an opinion had, in fact, formed just such an opinion. While the Court does not dispute that the majority of this sub-group indicated an opinion of guilt, each of those prospective jurors was subsequently dismissed by the Court.

no longer necessary for a defendant to show that community prejudice has permeated the jury box." *Parker*, 877 F.2d at 330. Instead, it is sufficient for a defendant to " . . . demonstrate that prejudicial, inflammatory publicity about his case so saturated the community from which his jury was drawn as to render it virtually impossible to obtain an impartial jury. [. . .] Proof of such poisonous publicity raises a presumption that [defendant's] jury was prejudiced, relieving him of the obligation to establish actual prejudice by a juror in his case." *Id., quoting United States v. Chagra*, 669 F.2d 241, 250 (5th Cir.), *cert denied*, 459 U.S. 846 (1982). Any presumption that exists, however, can be rebutted by the government by demonstrating through *voir dire* that an impartial jury was actually impaneled in the defendant's case. *Id., citing United States v. Harrelson*, 754 F.2d 1153, 1159 (5th Cir. 1985).

In this case, Patel presented the Court with numerous news and media accounts regarding both the criminal case and the related civil cases. Based on these accounts, it is undeniable that there has been some media coverage of the criminal case and related civil cases over the past 4 to 5 years. However, a review of coverage reveals that the vast majority of the media accounts amount to nothing more than benign recitations of the general allegations made by the government – no more, in fact, than the prospective jurors were told by the Court when they first reported to jury duty.

This general statement, however, is not without exception. For example,

9

defendant attached a copy of an ad taken out in 2004 by local attorneys seeking claimants to file suit against Patel as well as several articles that address the settlement of several civil claims against local hospitals and Patel's malpractice insurer resulting from the allegations that form the basis of the government's case. Further, a few articles discussed the suppression hearing and ultimate ruling by the Court.[7] However, also included in Patel's exhibits are at least two television news accounts wherein patients of Patel stated their unequivocal belief that Patel is *innocent*. In fact, one of the defendant's patients stated that Patel "walks on water" and she "would not want to see anyone else."

Upon review of the exhibits provided by Patel, the Court found that the coverage of this case, both in the Lafayette area and nationally, as evidenced by the exhibits attached to defendant's motion, are a far cry from being sufficiently inflammatory or pervasive enough to mandate, or even support, a transfer. This point is best illustrated by analogy to other cases which have addressed this issue. For example, in the case of *Murphy v. Florida*, 421 U.S. 794 (1975), defendant appealed his conviction on the basis that the lower courts erred in failing to transfer his case to a venue unaffected by pre-trial publicity. There, the defendant, colloquially known as "Murph the Smurf" by the media, was charged with a highly publicized robbery. In addition to the coverage of the robbery itself, there was also

---

[7] While these articles were also generally benign factual recitations, they did contain more information than was provided by the Court on the first day of *voir dire*.

intense media coverage of the defendant, his prior criminal history, and his "flamboyant lifestyle." Further,

> Before the date set for petitioner's trial on the instant charges, [defendant] was indicted on two counts of murder [. . . .]; the Dade County court declared petitioner mentally incompetent to stand trial; he was committed to a hospital and the prosecutor nolle prossed the robbery indictment. In August 1968 he was indicted by a federal grand jury for conspiring to transport stolen securities in interstate commerce. After petitioner was adjudged competent for trial, he was convicted on one count of murder in Broward County (March 1969) and pleaded guilty to one count of the federal indictment involving stolen securities (December 1969). The indictment for robbery was refiled in August 1969 and came to trial one year later.
> *Murphy,* 421 U.S. at 795-796.

All of these events "drew extensive press coverage," and "[t]he record [ . . . ] contain[ed] scores of articles reporting on petitioner's trials and tribulations during this period; many purportedly relat[ed] statements that petitioner or his attorney made to reporters." *Id.*

During jury selection, it was found that twenty of the forty-eight potential jurors not excused for personal reasons were excused for having prejudged the defendant. Defendant filed a motion to transfer venue, which was denied, and, after his conviction, appealed the denial of his motion. Noting that "[q]ualified jurors need not [. . .] be totally ignorant of the facts and issues involved," the United States Supreme Court upheld the defendant's conviction. The Supreme Court, agreeing with the district court, found that most of the media coverage had occurred over seven months prior to the trial and that, in any event, was largely factual in nature. As

such, the Court could not find that the attention was so sufficiently pervasive as to poison the prospective jury pool.

In *Parker, supra*, the defendant was charged with and convicted of two counts of conspiracy to commit forcible abduction. Defendant appealed his conviction at least in part on the basis of extensive pre-trial publicity. The Fifth Circuit noted that there had, in fact, been "widespread" coverage of the disappearance and subsequent investigation. However, finding that the defendant had ". . . not demonstrated that this publicity was in excess of the sensationalism inherent in the crime or that pervasive community prejudice resulted from this publicity," the Court affirmed defendant's conviction. *Parker*, 877 F.2d at 331.

Again in *Malmay, supra*, the Fifth Circuit addressed the problems of pre-trial publicity. There, the defendants were charged as the result of a large-scale investigation into vote-buying schemes in the Shreveport area. Local news media heralded the incident as the "Story of the Year" and polls conducted demonstrated that forty-eight percent of those polled believed the vote buying allegations to be true.[8] Moving for a change in venue, Malmay contended that there was a latent bias among the jurors in the Shreveport division. Noting that, generally, ". . . voir dire examination is the appropriate mechanism for screening jurors to avoid bias," and

---

[8]    In fairness, the polls also demonstrated that there was "very little awareness of Malmay individually," and that only "one percent [ . . . ] said he was innocent [and] five percent said he was guilty." Despite this, the Court noted that "[t]he allegation of impossibility of ferreting out such latent bias in half the population is not a strong argument." *Malmay*, 671 F.2d at 876.

the trial court's extensive voir dire, the Court found no "substantial ground for overturning the district court's denial of intradistrict transfer, even though that might have been a reasonable and prudent measure to avoid any effects of the publicity." *Malmay,* 671 F.2d at 876.

By comparison, in the seminal case of *Rideau v. Louisiana*, 373 U.S. 723 (1963), the defendant was convicted of murder in Lake Charles, Louisiana after a twenty minute long videotaped "confession" had been broadcast three times in the Lake Charles area before the commencement of trial. In that case, Justice Stewart, speaking for the United States Supreme Court, held that the broadcast " . . . to the tens of thousands of people who saw and heard it, in a very real sense was Rideau's trial - at which he pleaded guilty to murder." *Rideau*, 373 U.S. at 726. Three members of the jury which convicted Rideau had seen the broadcast and two members of the jury were deputies of the sheriff who produced the video. In this extreme case, the Court "[did] not hesitate to hold, without pausing to examine a particularized transcript of voir dire examination of the members of the jury, that due process of law in this case required a jury drawn from a community of people who had not seen and heard Rideau's televised 'interview.'" *Id.*

In the same vein as *Rideau* is *Irvin v. Dowd*, 366 U.S. 717 (1961). There, defendant was charged with six highly publicized murders in Evansville, Indiana. After his arrest, the prosecutor and other county officials, "issued press releases, which were intensively publicized, stating that the petitioner had confessed to the six

13

murders." *Irvin*, 366 US at 719-720. The Court recounted the media attention noting

that . . .

> . . .the build-up of prejudice is clear and convincing. An examination of the then current community pattern of thought as indicated by the popular news media is singularly revealing. For example, petitioner's first motion for a change of venue from Gibson County alleged that the awaited trial of petitioner had become the cause ce le bre of this small community-so much so that curbstone opinions, not only as to petitioner's guilt but even as to what punishment he should receive, were solicited and recorded on the public streets by a roving reporter, and later were broadcast over the local stations. A reading of the 46 exhibits which petitioner attached to his motion indicates that a barrage of newspaper headlines, articles, cartoons and pictures was unleashed against him during the six or seven months preceding his trial. The motion further alleged that the newspapers in which the stories appeared were delivered regularly to approximately 95% of the dwellings in Gibson County and that, in addition, the Evansville radio and TV stations, which likewise blanketed that county, also carried extensive newscasts covering the same incidents. These stories revealed the details of his background, including a reference to crimes committed when a juvenile, his convictions for arson almost 20 years previously, for burglary and by a court-martial on AWOL charges during the war. He was accused of being a parole violator. The headlines announced his police line-up identification, that he faced a lie detector test, had been placed at the scene of the crime and that the six murders were solved but petitioner refused to confess. Finally, they announced his confession to the six murders and the fact of his indictment for four of them in Indiana. They reported petitioner's offer to plead guilty if promised a 99-year sentence, but also the determination, on the other hand, of the prosecutor to secure the death penalty, and that petitioner had confessed to 24 burglaries (the modus operandi of these robberies was compared to that of the murders and the similarity noted). One story dramatically relayed the promise of a sheriff to devote his life to securing petitioner's execution by the State of Kentucky, where petitioner is alleged to have committed one of the six murders, if Indiana failed to do so. Another characterized petitioner as remorseless and without conscience but also as having been found sane by a court-appointed panel of doctors. In many of the stories petitioner was described as the 'confessed slayer of six,' a parole

> violator and fraudulent-check artist. Petitioner's court-appointed counsel was quoted as having received 'much criticism over being Irvin's counsel' and it was pointed out, by way of excusing the attorney, that he would be subject to disbarment should he refuse to represent Irvin. On the day before the trial the newspapers carried the story that Irvin had orally admitted the murder of Kerr (the victim in this case) as well as 'the robbery-murder of Mrs. Mary Holland; the murder of Mrs. Wilhelmina Sailer in Posey County, and the slaughter of three members of the Duncan family in Henderson County, Ky.'
> *Id.*

Defendant was granted a change of venue, but only to the next county over where

the murders had been just as highly publicized and followed. Defendant sought a

second change of venue, but the Court denied the request on the basis that the

Indiana statutes only allowed one such change. Writing for the Court, Justice Clark

stated

> In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.
> *Irvin*, 366 U.S. at 722-23.

Considering the pervasiveness and salaciousness of the media coverage, the

Supreme Court held that a "pattern of deep and bitter prejudice" existed in the

community sufficient to render fair jury selection all but impossible. Combined with

the fact eight of the twelve *seated jurors* thought the defendant was guilty at the

15

commencement of trial,[9] the Court found that the defendant had not received a fair trial and reversed the conviction.

The current case is in stark contrast to *Rideau* and *Irvin*. Here, there was *some*, but not pervasive, media coverage. However, a criminal defendant is not entitled ". . . to a trial by a body of jurors ignorant of all facts surrounding a case, but only an impartial jury that will render a verdict based exclusively on the evidence presented in court." *Malmay*, 671 F.2d at 876. It has long been held that". . . a change of venue *should not* be granted on the mere showing of wide-spread publicity." *Parker*, 877 F.2d at 330 (*citing Calley v. Callaway*, 519 F.2d 184, 205-06 (5th Cir. 1975) (*en banc*), *cert. denied sub nom. Calley v. Hoffman*, 425 U.S. 911 (1976)) (*emphasis added*).

Further, it is undisputable that, while there was been some recent press, the bulk of the coverage occurred over two years ago when the indictment issued and the settlements with the hospitals were completed. As true as Justice Clark's observation regarding the "swift, widespread, and diverse methods of

---

[9]     "Finally, and with remarkable understatement, the headlines reported that 'impartial jurors are hard to find.' The panel consisted of 430 persons. The court itself excused 268 of those on challenges for cause as having fixed opinions as to the guilt of petitioner; 103 were excused because of conscientious objection to the imposition of the death penalty; 20, the maximum allowed, were peremptorily challenged by petitioner and 10 by the State; 12 persons and two alternates were selected as jurors and the rest were excused on personal grounds, e.g., deafness, doctor's orders, etc. An examination of the 2,783-page voir dire record shows that 370 prospective jurors or almost 90% of those examined on the point (10 members of the panel were never asked whether or not they had any opinion) entertained some opinion as to guilt-ranging in intensity from mere suspicion to absolute certainty. A number admitted that, if they were in the accused's place in the dock and he in theirs on the jury with their opinions, they would not want him on a jury." *Irvin*, 366 U.S. at 727.

communication" was in 1961, it is infinitely more true today with the advent of the cable television, the 24-hour news cycle, and, of course, the ubiquity of the internet. To expect an entire jury venire – even a jury venire in another division of this district – to be completely ignorant of the facts of this case is beyond comprehension. This is buttressed by the fact that each of the newspaper articles attached to defendant's motion was posted on the website of the respective publication. Admittedly, the interest in the story is primarily local, but there is no doubt in the Court's mind that this story enjoys some following in every corner of the state. Additionally, almost without fail, the coverage has been factual in nature and in no instance has the media coverage been, in any way, inflammatory.[10] In sum, this trial is far from being conducted in an " . . . atmosphere [. . .] 'utterly corrupted by press coverage.' " *United States v. Lipscomb*, 299 F.3d 303, 344 (5th Cir. 2002) (*citing Black v. Collins*, 962 F.2d 394, 409 (5th Cir. 1992)); *See also Dobbert v. Florida*, 432 U.S. 282, 303 (1977).

In addition, any possible prejudicial effect of the media coverage was vitiated by the Court's extensive voir dire and great latitude afforded the attorneys in questioning the prospective jurors. "Courts have generally felt that voir dire examination is the appropriate mechanism for screening jurors to avoid bias." *Malmay*, 671 F.2D at 876.

---

[10]     The sole *arguable* exception is that of the advertisement by local attorneys seeking claimants. However, that advertisement was also largely benign in nature and ran in 2004 – over four years prior to the commencement of jury selection.

> '[T]he obligation to impanel an impartial jury lies in the first instance with the trial judge, and because he must rely largely on his immediate perceptions, federal judges have been accorded ample discretion in determining how best to conduct the voir dire.' ... Therefore, the district court's decision to employ a particular procedure will not be lightly overturned." *Chagra*, 669 F.2d at 250. A district court does not abuse its discretion as long as it adopts procedures that create a reasonable assurance that any prejudice of the jurors will be discovered, if present. *United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir.1976).
> *Parker*, 877 F.2d at 331.

The details of the voir dire allowed in this case have been described and will not be

repeated here. Suffice it to say, every potential juror was questioned individually by

both the Court and the attorneys about a wide variety of topics. If there is a more

extensive method in which to ferret out possible prejudice, the Court cannot fathom

it.[11] Based on the exhaustive questioning, this Court has provided the defendant, at

a bare minimum, "reasonable assurance that prejudice would be discovered if

---

[11]      In *Parker, supra*, the trial court employed, and the Fifth Circuit approved of, a voir dire procedure not unlike the one employed here:

> The district court in this case employed a hybrid procedure, questioning the jurors as a group and individually, as necessary. Each prospective juror who responded affirmatively to the question whether they were familiar with the case was questioned separately. One potential juror was immediately excused by the court as a result of this questioning. Numerous questions exploring the prospective jurors' attitudes, familiarity with the persons and places involved, and exposure to news photographs of Parker were asked. **Based on the meticulous method with which the district court approached the voir dire, we conclude that there was a "reasonable assurance that prejudice would be discovered if present."** *United States v. Hawkins*, 658 F.2d 279, 283 (5th Cir.1981). *Parker*, 877 F.2d at 331 (emphasis added).

The primary difference in the procedures employed is that this Court *went two steps further* by questioning *every* potential juror individually and allowing the attorneys to also question each individual venireman. Unwittingly, the procedure employed by this Court tracks the American Bar Association standards governing the selection of a jury in criminal cases where questions of possible prejudice are raised. *See American Bar Association Criminal Justice Standard 8-3.5.*

present." *United States v. Hawkins*, 658 F.2d 279, 283 (5th Cir. 1981).

In addition to pretrial publicity, the defendant also pointed to individual responses of potential jurors to show that, in fact, there existed hostility towards him. It is true, that some of the prospective jurors indicated that they had formed opinions of guilt. It is further true, that this case was described as a "hot topic" of conversation among those in the medical community and many in the general populous. However, it is also true that many in the venire had never heard of the defendant at all and that, of those who had heard of him, several of the potential jurors had a high opinion of the defendant. While it is a true statement that "[t]he juror is poorly placed to make a determination as to his own impartiality," this Court did not rely solely on the juror's statement as to each's own impartiality. It is noteworthy that thirty-two potential jurors in the jury pool from which the jury and six alternates were ultimately selected were qualified *without objection by either party* including thirty-six without objection from the defendant and thirty-eight without objection from the government. This is more than just seating a jury which conforms to the *Court*'s standard of fairness, it is seating a jury which, by the defendant's own failure to object, conformed to *his* standard of fairness. This Court is convinced beyond the shadow of a doubt, that the jury actually impaneled is a fair one by every standard and that, accordingly, the defendant was not entitled to a transfer of venue.

B. *Sealing of Motions*

The Court will briefly address defendant's objection to the sealing of the

19

motions at bar. At the outset, the Court notes that counsel for the defendant conceded that no harm befell Patel as a result of the Court's decision to seal the record of his motion for change of venue, as supplemented, and cited no legal basis for his objection. However, to determine whether the record was properly sealed, the Court must balance the public's common law right of access against interests favoring non-disclosure. See S.E.C. v. Van Waeyenberghe, 990 F.2d 845, 849 (5th Cir.1993). "Courts have recognized that the public has a common law right to access judicial records and proceedings, although the right is not absolute." Bahwell v. Stanley-Bostitch, Inc., 2002 WL 1298777, at * 1 (E.D.La. June 10, 2002). "Public access serves important interests, such as 'to promote trustworthiness of the judicial process, to curb judicial abuses, and to provide the public with a more complete understanding of the judicial system, including a better perception of fairness.' " Id. (quoting Van Waeyenberghe, 990 F.2d at 849). "Accordingly, 'the district court's discretion to seal the record of judicial proceedings is to be exercised charily.' " Id. (quoting Van Waeyenberghe, 990 F.2d at 848).

Although countervailing interests may outweigh the right of public access, the party seeking to overcome the presumption of access bears the burden of showing that the interest in secrecy outweighs the presumption. Leucadia, Inc. v. Applied Extrusion Technologies, Inc., 998 F.2d 157, 165 (3d Cir.1993). The decision as to access is left to the discretion of the trial court, Nixon v. Warner Communications, Inc., 435 U.S. 589, 599, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), but any doubt must

be construed in favor of disclosure. *Marcus v. St. Tammany Parish Sch. Bd.*, 1997 WL 313418, at \*5 (E.D.La. June 9, 1997) (*citing Grove Fresh Distributors, Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir.1994)). Finally, that no third party objects to the sealing of the records here is "inconsequential," because the presumption of openness does not depend on such an objection. *Stalnaker v. Novar Corp.*, 293 F.Supp.2d 1260, 1263 (M.D.Ala.2003); *see also Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir.1999) ("The judge is the primary representative of the public interest in the judicial process and is duty-bound therefore to review any request to seal the record (or part of it) ... [She] may not rubber stamp a stipulation to seal the record.") (internal citations omitted).

As the primary representative of the public interest and considering the factors enunciated above, the Court found that *at the time* of the filing of defendant's motion, the public's right to access was substantially outweighed by the need for non-disclosure. Briefs in support and opposition to these motions reference juror names and specific information gleaned from voir dire questioning. The public's right to know this information simply did not outweigh the prospective jurors' right to privacy. Accordingly, the Court will lift the seal but only after the Clerk of this Court has redacted the filings to the extent that the names or other personal information related to the identity of specific jurors has been included.

## III. CONCLUSION

While finding that there was some degree of awareness in the community

regarding this case and the related civil cases, the Court in its September 30, 2008 oral ruling found that the level of awareness simply did not rise to the level required to support an intra-district transfer. As previously noted, a criminal defendant is not entitled ". . . to a trial by a body of jurors ignorant of all facts surrounding a case, but only an impartial jury that will render a verdict based exclusively on the evidence presented in court," and the defendant did not approach meeting his burden of showing the necessary prejudice in the community. *Malmay*, 671 F.2d at 876. The Court is convinced beyond reasonable question that the jury actually selected to judge this case is a fair and impartial jury. Accordingly, defendant's Motion to Change Venue [Rec. Doc. 166] and Supplemental Motions [Rec. Docs.169, 170, and 175] were denied.