# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE-OPELOUSAS DIVISION

UNITED STATES OF AMERICA       CRIMINAL ACTION NO. 06-60006

VERSUS       JUDGE MELANÇON

MEHMOOD M. PATEL       MAGISTRATE JUDGE METHVIN

## MEMORANDUM RULING

Before the Court are the government's Motion for Preliminary Order of Forfeiture [Rec. Doc. 278], defendant's Response in Opposition thereto [Rec. Doc. 284], and the government's Reply to defendant's Response [Rec. Doc. 292]. Also before the Court are defendant's Motion for New Trial [Rec. Doc. 280], Motion for Acquittal [Rec. Doc. 281], Motion to Set Aside Judgment [Rec. Doc. 282], Motion for Permission to Conduct Post-trial Juror Interviews [Rec. Doc. 283], Supplemental Motion for New Trial [Rec. Doc. 285], Supplemental Motion to Conduct Post-trial Juror Interviews [Rec. Doc. 286], and Motion for Hearing on Motions to Conduct Post-trial Juror Interviews [Rec. Doc. 288]; the government's Response in Opposition to Motion for Hearing on Motion for Permission to Conduct Post-trial Juror Interviews [Rec. Doc. 289], Response in Opposition to Motion to Set Aside Judgment [Rec. Doc. 290], Response in Opposition to Motion for Acquittal [Rec. Doc. 291], Response in Opposition to Motion for New Trial [Rec. Doc. 293], and Objection to Motion and Supplemental Motion to Conduct Post-trial Interviews [Rec. Doc. 294]; and defendant's Reply to the government's Opposition to his Motion to Conduct Post-trial Juror Interviews [Rec. Doc. 295] and Reply to the government's Opposition to Motion for New Trial [Rec. Doc. 296]. For the following

reasons, as well as the reasons previously assigned in the Court's written and oral rulings issued prior to and during the trial the Court will **GRANT** the government's Motion for Preliminary Order of Forfeiture [Rec. Doc. 278] and **DENY** defendant's post-trial motions [Rec. Docs. 280, 281, 282, 283, 285, 286, and 288].

At the outset, the Court notes that, with the exception of the assertion that there existed ". . . an unusual degree of closeness between the judge and the jury," *Motion for New Trial* [Rec. Doc. 280], pg. 10, and that the modified *Allen* charge given by the Court was coercive, *id.* at pg. 3, all arguments advanced by defendant in his post-trial filings were previously raised and argued by the attorneys and addressed by the Court in oral and written rulings.

The Court notes further that both the government and the defendant purchased and had access to realtime transcription throughout all testimony adduced, arguments made, and oral rulings issued by the Court during the entirety of the trial. While not the official transcript free of all typographical errors, the attorneys for the parties had the capacity not only to see the words as they were being spoken, but the ability at the end of each day, or intermittently during the day, to print a hard copy of the realtime transcript. Thus, the attorneys had the same access to the realtime transcript as did the Court when motions were made during and post trial.

The Court, based on its ten years of experience with realtime transcription and more than seven years of working with the court reporter who covered the trial, has an extremely high level of confidence that once an official transcript is ordered and paid

for by a party that, but for routine typographical errors and unintelligible words common to realtime transcripts, the realtime transcript and the official transcript will be essentially one and the same.

For the benefit of the judges of the United States Court of Appeals for the Fifth Circuit who will have the opportunity to read this ruling and the official transcript, as the realtime transcript page numbers will not be the same as the official transcript page numbers, the Court has endeavored, where possible, to set out the date or dates on which the matters that form the basis of defendant's motions arose, were argued, and disposed of by the district court.

## I. BACKGROUND

As the parties are intimately familiar with the extensive history leading up to the trial of this case and as this history has on numerous occasions been exhaustively detailed on the record, the Court will not repeat that history. It suffices to say that defendant, Dr. Mehmood M. Patel ("defendant" or "Patel"), was charged with ninety-one counts of health care fraud in violation of 18 U.S.C. § 1347 and one count of criminal forfeiture pursuant to 18 U.S.C. § 982. After an exhaustive jury selection which began on September 17, the trial on the merits commenced on October 1.[1] On December 16, after eleven weeks of testimony, including the testimony of not less than eighty government witnesses, several defense witnesses, and nineteen days of testimony by

---

[1] This was the Court's second attempt at jury selection in the case. The first, which began on August 25, was ultimately thwarted by Hurricane Gustav. For a full discussion of the first and second jury selections, see the Court's Memorandum Ruling on defendant's Motion to Transfer Venue [Rec. Doc. 243], pgs. 3-6.

defendant, the jury was instructed and retired to begin their deliberations.[2]   On

December 30 at 5:10 p.m., the jury returned its verdict finding Patel guilty of 51 counts

of the indictment and not guilty on the remaining 40 counts.  In compliance with Federal

Rule of Criminal Procedure 32.2, the government now moves for a judgment of

forfeiture pursuant to 18 U.S.C. § 982.  Alleging several errors, Patel filed post-trial

motions seeking various relief.   Each of the asserted errors, as well as the

government's Motion for Forfeiture, will be addressed in turn.

## II.  LAW & ANALYSIS

As previously noted, defendant has presented few new arguments post-verdict.

Rather, defendant reurges many of the same objections lodged during trial, but offers

no new law or analysis other than that which was already rejected by the Court.

Accordingly, in some instances where the defendant and the government each relied

on their previous briefs and memoranda, the Court will rely by reference on its previous

oral and written rulings.

*A.*      *Defendant's Motion For New Trial*

*1.*      *The Allen Charge*

On December 29, the jury sent two separate notes to the Court indicating that

the jurors had reviewed the evidence and had been unable to come to a unanimous

---

[2]     Excluding the 10-day jury selection, the trial lasted approximately 11 weeks including a
break for the Thanksgiving holiday.  Jury deliberations lasted 2 weeks including a break
for the Christmas holiday.  Based on the best good faith estimates of counsel, during
selection the potential jurors were told that the trial would last no more than six to seven
weeks.  Nonetheless, the trial, starting with jury selection on September 17 and ending
with the delivery of the verdict on December 30, occurred over a period of 104 days.

agreement on any count of the indictment.  The first note was received by the Court at 12:45 p.m.  At that time, the government requested that the Court give the jury the *Allen* charge.  Defense counsel objected to the government's request and urged the Court to declare a mistrial or, alternatively, requested that the Court simply reread the instructions to the jurors on their duty to deliberate.  In arguing defendant's position, defense counsel admitted that were the Court to grant his request to simply reread the specific instructions on the duty to deliberate, should another note indicating deadlock be received, his objection to the *Allen* charge at that time would be "less compelling." The government ultimately acquiesced to defendant's request, and, at 1:06 p.m., the Court responded to the jury note by referring the jurors to the jury instruction on their duty to deliberate contained on pages 12 and 13 of the instructions.

After the Court received the second jury note indicating deadlock at 3:55 p.m., the parties were afforded the opportunity to research and argue their respective positions on the appropriateness of giving the *Allen* charge.  Over defendant's objection, the Court issued the Fifth Circuit pattern *Allen* charge, verbatim, to the jury at approximately 5:30 p.m.[3]  After the charge was given, the Court afforded the jury the option to continue its deliberations or adjourn until the morning.  At the jury's request, deliberations were adjourned until 9:30 a.m.  The following morning, December 30, the jury resumed its deliberations at 9:30 a.m. and, at 5:10 p.m. that day, returned its

---

[3] The Court issued the *Allen* charge verbally and provided the jury with a written copy of the charge as it had done with the previous charges.  Notably, both were done simultaneously.  The jury *was not* given the *Allen* charge more than once.

verdict.  Defendant now reurges his objection to the *Allen* charge and argues that, under the totality of the circumstances, the Court's supplemental jury instruction coerced the jury into reaching a verdict.  He further argues that the charge as given was factually incorrect and improper, thus warranting a new trial.      In *Allen v. United States*, 164 U.S. 492 (1896), the United States Supreme Court first recognized the propriety of the since monikered *Allen* charge.[4]  In *Allen*, Justice Henry Brown, writing for the Court, stated:

> The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror [should] not listen with deference to the arguments, and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury room with a blind determination that the verdict shall represent his opinion of the case at that moment, or that he should close his ears to the arguments of men who are equally honest and intelligent as himself.

*Allen*, 164 U.S. at 501-02.

Thus, the Supreme Court found no error in the giving of additional jury instructions to reconsider one's beliefs in light of the beliefs of others.  *Id.*  In the wake of the *Allen* decision, it has been consistently held that ". . . whether an *Allen* charge will be given, or when it will be given, is within the sound discretion of the trial judge."  *United States v. Scruggs*, 583 F.2d 238, 241 (5th Cir. 1978) (*citing United States v. Bass*, 490 F.2d 846, 855 (5th Cir. 1974); *and Hale v. United States*, 435 F.2d 737, 742 (5th Cir. 1970));

---

[4]    The *Allen* charge has also been colloquially referred to as the dynamite charge, the hammer charge, the third degree instruction, the shotgun instruction, and the nitroglycerin charge.

*See also United States v. Redd*, 355 F.3d 866, 877 (5th Cir. 2003) (*quoting United States v. Rivas*, 99 F.3d 170, 175 (5th Cir. 1996)). To uphold an *Allen* charge, courts look to (1) the semantic deviation from approved *Allen* charges and (2) the circumstances surrounding the *Allen* charge. *Redd*, 355 F.3d at 877 (*quoting United States v. Winters*, 105 F.3d 200, 203 (5th Cir. 1997)). After due consideration of defendant's filings and the record as a whole, giving the *Allen* charge and the charge as given were proper.

First, the Court instructed the jury using the pattern modified *Allen* charge expressly approved by the Fifth Circuit. Thus, there was no prejudicial deviation from the approved *Allen* charge. Nonetheless, defendant argues that the Court erred in telling the jury that, if a mistrial was declared, the case *must* be tried again. This argument has previously been flatly rejected by the Fifth Circuit. *See Winters*, 105 F.3d at 204. There was no error in using the language of the pattern *Allen* charge. *See United States v. Benjamin*, 129 Fed. Appx. 887, 889 (5th Cir. 2005) (approving of the use of the Fifth Circuit pattern modified *Allen* charge); *and United States v. Nguyen*, 28 F.3d 477, 483-84 (5th Cir. 1994) (same).

Second, defendant argues that, under the totality of the circumstances, the effect of the *Allen* charge was coercive. In support of this proposition, Patel points to the dismissal of Juror #9 during deliberations on December 22,[5] the timing of the *Allen*

---

[5] Patel also cites the dismissal of Juror #9 as an error in and of itself warranting a new trial. This argument will be addressed *infra*.

charge, the period of time between the charge and the verdict, the trial judge's perceived "atypical" relationship with the jury, and the fact that the Court gave the instruction both orally and in writing. Interestingly, while Patel makes much of the perceived effect of Juror #9's dismissal from the jury, he fails to note that both deadlock notices giving rise to the *Allen* charge occurred some five court days *after* Juror #9's dismissal. The Court's lack of a "psychiatry degree" aside,[6] it is quite clear that the dismissal had no coercive effect whatsoever on the jurors who were perfectly willing to let the Court know that, five court days after the dismissal of Juror #9, they were unable to come to a decision. Accordingly, no weight is afforded to defendant's argument that the dismissal gave rise to a fear of ". . . if you persist in rocking the boat, you will be removed from this jury." [7]

Similarly, the notion that the relationship between the judge and the jury was somehow "atypical" lacks merit. It is true that during the course of the trial, on several occasions, the Court referred to being a male breast cancer survivor. Certain breaks in the trial were also explained by reference to the trial judge's on going treatment. However, it is also true that other breaks in the trial were explained by reference to *defendant's and defense counsels' illnesses and other medical issues.* At a minimum, the jury deserved those explanations for the extended service they were rendering to the criminal justice system. As detailed in footnote 2, at the outset of jury selection the

---

[6] *See Defendant's Motion for New Trial* [Rec. Doc. 280], pg. 12.

[7] *Id.*

8

jurors and six alternates selected to hear the case were told that this case would last no longer than six to seven weeks, yet, excluding the two and a half week jury selection, the trial itself lasted more than 11 weeks and the deliberations consumed an additional 2 weeks.  To not explain to the jury and alternates why there were breaks in this already lengthy trial would not only have been unfair, it would have bordered on being inhumane.  It is also of note that at no time did the defense counsel express any concern, much less lodge an objection, to the Court's candor with the jury.

The same is true of the unsolicited sixty-six dollars collected for breast cancer research by the 18 individuals who constituted the jury and alternates on October 9. On October 8, the trial judge attended but was not an honoree at, as was asserted by defense counsel, an annual breast cancer symposium.  The following day, in the spirit of October being National Breast Cancer Awareness Month,[8] the trial judge wore a pink feather boa and placed a pink rose, which he had received for participating in the previous night's events, on the bench.  When the jury entered the courtroom that morning, the judge explained the reasons for his wearing of the boa and for the rose to the jury.  That afternoon, the jurors asked the courtroom deputy to see the judge. The jury's request was relayed in open court to the lawyers who expressed no objection to the judge going to the jury room as requested.  When the  judge met with the jury, he was advised that they had collected money for breast cancer research and asked the judge to direct the funds to an appropriate organization.  Upon returning to

_____

[8]     *See National Breast Cancer Awareness Month*, http://www.nbcam.org.

the courtroom, but before the jury returned, the Court advised the attorneys for the parties of the jury's action. While looks can sometimes be deceiving, the attorneys for the parties appeared genuinely moved by the jury's actions. On October 14, the jury was advised in open court that the sixty-six dollars that had been collected was donated to the Susan G. Komen Foundation, a well known national breast cancer foundation that gives grants for research and for treatment of the uninsured. Defense counsel expressed absolutely no concern nor objection during trial to any of the events referred to hereinabove despite the fact that they were well informed of all circumstances and witnessed the events in open court.

Based on the totality of the circumstances, nothing cited by defendant, collectively or individually, is indicative of an inappropriate relationship between the trial judge and the jury. Nonetheless, had such a relationship been established, it would be of no consequence. The trial judge, like the jury, had no interest in the outcome of the case. Defendant argues, however, that the alleged "atypical" relationship fostered a desire to please the judge by coming to a decision in the case. Assuming, *arguendo*, that that was the case, the United States Supreme Court, in *Allen*, stated that the very purpose of the jury is, " . . . to secure unanimity by a comparison of views." *Allen*, 164 U.S. at 501. This is precisely what the jury in this case did. Patel's sole argument, then, is that the Court's allegedly "atypical" relationship persuaded the jury to come to a decision. While the charge may have been the "last word" of the Court, it was neither in favor of defendant nor the government and was consistent with the law. While it is

clear from the record that no such "atypical" relationship existed, any such relationship would have nonetheless not been prejudicial to defendant and would not have made the Allen charge any more or less coercive.

Patel also argues that the charge was coercive in light of the holidays and the schedule of deliberations prepared by the Court after consulting with counsel for the parties. The schedule for jury deliberations is generally within the discretion of the trial court, and, without more cannot constitute coercion. *See United States v. White*, 589 F.2d 1283, 1290 (5th Cir. 1979); *See also United State v. Caracci*, 446 F.2d 173, 177 (5th Cir. 1971). While the Court did deny the jury's request to take a two-week break in deliberations on December 18, a request made after only two days of deliberations, the Court nonetheless instructed the jurors that they would have Christmas Eve day, Christmas Day, New Year's Eve day, and New Year's Day off.[9] With the exception of the holiday breaks, the jury was scheduled to deliberate Monday through Saturday with Sundays at their option. The jury was not given a time frame within which to return its verdict nor did the Court force excessively long days on the jury.[10] The jury was informed that after the holidays, a Monday through Friday schedule would be resumed if deliberations continued into the new year. The jury returned its verdict on December

---

[9] Prior to the commencement of deliberations, the Court generally, after conferring with the attorneys, allowed the jury to set the schedule as the trial had lasted much longer than they had been told it would. This obviously could not be the case once deliberations began.

[10] In general, the jury was given the option to begin deliberations at 9:00 or 9:30 a.m. and conclude at 5:00 or 5:30 p.m. with lunch provided in the jury room by the Court. The jury was also given the option to begin before 9:00 a.m. or continue after 5:30 p.m. if they so chose.

11

30 at 5:10 p.m.  There is no evidence that the holidays in any way influenced the jury's verdict .[11]

The defendant next argues that the amount of time between the giving of the *Allen* charge and the delivering of the verdicts compels the conclusion that the jury's verdicts were coerced.  Following the *Allen* charge which occurred late in the afternoon of December 29, the jurors, at their request, were discharged for the day.  The next day, December 30, the jury deliberated for more than 7 hours which, according to defendant, equates to only 4.6 minutes per count.  Based on this timing, counsel " . . . suggests that if the circumstances of this case do not establish coercion, then an *Allen* charge can <u>never</u> be considered coercive."  *Defendant's Response to Government's Objection to Defendant's Motion for New Trial* [Rec. Doc. 296], pg. 2.  Interestingly, defendant did not cite and the Court could not find any case in which a court approved of or considered the method of calculation advanced in the motion.  However, using defendant's approach, his position is belied by Fifth Circuit jurisprudence.[12]  Further,

---

[11]   It is of note that what most people in south Louisiana consider to be the major holiday of the season, Christmas, had already come and gone by the time the jury returned its verdict on the evening of December 30.

[12]   For example, in the case of *United States v. Scruggs*, *supra*, six defendants were each charged with one count of conspiracy to transport altered money orders in interstate commerce, and defendant Scruggs was charged with an additional twelve counts of causing altered money orders to be transported in interstate commerce and aiding and abetting others to do the same.  *Scruggs*, 583 F.2d at 239.   After the jury had begun its deliberations, but prior to any deadlock notice, the Court issued an *Allen* charge at 10:38 p.m.   Forty-eight minutes later, the jury returned a verdict finding Scruggs and his co-defendants guilty.  On appeal, Scruggs alleged that the timing of the verdicts was indicative of coercion.  The Fifth Circuit, however, disagreed and found no abuse of discretion.  *Id.* at 241.   Using Patel's math and assuming that the other five defendants were not charged with the other twelve counts of the indictment, six defendants were charged in Count 1 totaling six counts plus the twelve additional counts Scruggs was charged with equaled 18 total counts to be considered.  Forty-eight minutes divided by 18

the verdict delivered by this jury was a discriminating one. The jury was deadlocked on all counts, but ultimately returned a verdict of guilty on 51 counts and acquitted defendant on 40 counts.[13] Based on the applicable jurisprudence and the facts of the case, regardless of how one views the timing of the verdict after the *Allen* charge, no coercion is implied.

Next, defendant argues that the Court's giving a written copy of the *Allen* charge to the jury in addition to reading the charge could "possibly" have made the charge coercive.[14] The Fifth Circuit has stated that ". . . whether the jury should be given a

---

counts equals 2.66667 minutes, or 2 minutes and 40 seconds, per count. Were the Court to simply divide the thirteen counts of the indictment by the forty-eight minutes, which would be incorrect, the time per count would still only be 3.6923 minutes, or 3 minutes and approximately 41 seconds, per count.

Similarly, in *United States v. Winters*, *supra*, two defendants argued that the temporal proximity of the *Allen* charge to the guilty verdicts necessarily implied coercion. *Winters*, 105 F.3d at 203. There, five defendants were charged with an indictment containing no less than nine counts. After deliberating for seven hours, the jury in that case informed the judge that they were hung as to all counts with the exception of one. The judge accepted the verdict on the one count and then issued an *Allen* charge on the remaining counts. Thirty minutes later, the jury returned a guilty verdict against two defendants and acquitted the others. *Id.* In finding that the timing of the verdicts did not demonstrate coercion, the Fifth Circuit noted that the verdict was a discriminating one and that ". . . at the same time it found Winters to be guilty, it also found the remaining defendants, upon whom it had also been hung, to be not guilty." *Id.* at 204. Again, using Patel's math, as both defendant Winters and defendant Johns were named in count nine of the indictment, there was a minimum of ten counts to be considered by the jury. Prior to the *Allen* charge, the jury indicated it had come to a decision on one of the counts, thus leaving nine to be considered after the *Allen* charge was given. Thirty minutes divided by a minimum of nine counts equals 3.3333 minutes, or 3 minutes and 20 seconds, per count.

[13] *See United States v. Heath*, 970 F.2d 1397, 1406 (5th Cir. 1992)(finding that the *Allen* charge was not coercive in part due to the fact that ". . . the jury's verdict was a discriminating one - after further deliberation, the jury remained deadlocked on two counts and acquitted the Defendants of several others.")

[14] The Court is compelled to note the inconsistency in defendant's positions. When responding to the jury's first deadlock notice, defendant argued that sending a written response to the note would be "less of a big deal" than re-instructing them orally. Conversely, defendant now argues that providing a written copy of the *Allen* charge to jury raised the ". . . possibility that individual jurors re-read the charge," thus rendering the

written copy of the court's charge is within a trial judge's discretion." *United States v. Sotelo*, 97 F.3d 782, 792-93 (5th Cir. 1996) (*citing United States v. Acosta,* 763 F.2d 671, 677 (5th Cir. 1985)).  While it has "disapproved of the practice," the Fifth Circuit has also stated, ". . . that the practice was not error in itself."  *Id.* at 792-93 (*citing United States v. Perez*, 648 F.2d 219, 222 (5th Cir. Unit B 1981)); *See also United States v. Oreira*, 29 F.3d 185, 191 (5th Cir. 1994).  In large part, the analysis of whether giving written instructions to the jury rises to error focuses on whether any portion of the jury instructions were given or could have been given greater weight than other parts.  *United States v. Hooper*, 575 F.2d 496, 499 n.4 (5th Cir. 1978).  This concern may be alleviated by instructing the jury to consider the instructions as a whole and not give any one instruction more emphasis than another.  *Id.*

In the original instructions given to the jury, a copy of which each juror was allowed to take into the jury room during deliberations, the Court stated, "You have no right to disregard or give special attention to any one instruction, or to question the wisdom or correctness of any rule I may state to you."  In the *Allen* charge the Court, again, stated "I will ask now that you retire once again and continue your deliberations with these additional comments in mind to be applied, of course, in conjunction with all of the instructions I have previously given to you."  Thus, the jury was instructed to consider the charges as a whole at all times.  Had the Court *not* given a written copy of the *Allen* charge to the jury, it would have singled out that charge as being either

_____

charge coercive.  *Defendant's Motion for New Trial* [Rec. Doc. 285], pg. 8 n. 7.

14

more important or less important than the others.  This case is distinguishable from *United States v. Fossler*, 597 F.2d 478 (5th Cir. 1979), referenced by the Court in the December 29 hearing and cited by the defendant in support of his motion.  In that case, the *Allen* charge was given orally, after which the jury sent an additional deadlock notice.  Following the second notice, the Court sent a written copy of the charge, and the jury came back with a verdict.  *Fossler*, 597 F.2d at 484.  Here, there was no post-*Allen* charge deadlock notice and no second *Allen* charge.  Rather, the Court gave the *Allen* charge only once and instructed the jury to consider it with the other previously given instructions.  No special weight was given to any one instruction, *Allen* or otherwise. Providing the jury with a written copy of the *Allen* charge and the other jury charges was not error.

Lastly, defendant argues that, while each of these circumstances may not individually give rise to the inference of coercion, taken together the totality of the circumstances dictates that the jury's verdict was coerced.  It is a correct statement of the law that the totality of the circumstances must be viewed to determine whether the jury was coerced; however, in this case there are simply no indications of coercion. After the dismissal of Juror #9, the jury deliberated for five full days prior to the *Allen* charge and an additional day after it was given.  No deadlines were imposed, the jury was not required to come in on Sundays or holidays, and was not required to stay late into the evenings or begin early in the mornings.  The verdict reached by the jury was a considered and discriminating one - finding defendant guilty of 51 counts and not-

guilty of 40 counts. "In light of the complexity of the case, the sophistication of the [medicare fraud scheme], and the length of the indictment, the court did not err in giving the jury an *Allen* charge rather than declaring a mistrial." *Heath*, 970 F.2d at 1406, (*citing United States v. Lindell*, 881 F.2d 1313, 1321 (5th Cir. 1989)).[15] Considering the totality of all the circumstances, the *Allen* charge was proper and non-coercive.

2.    *Response to Jury Question Number 3*

In its third note, received by the Court on December 18, the jury requested the definition of "intent." In response, the Court defined intent by stating, "You may find intent to defraud if you find that the defendant acted knowingly, as defined in the jury instructions set out starting on the last line of page 8 and ending on page 9 of the jury instructions, with the specific intent to deceive." This response was taken from the agreed upon jury instructions given to the jury at the commencement of deliberations. In pertinent part, the referenced jury instruction stated, "The defendant acts with the requisite 'intent to defraud' if the defendant acted knowingly and with the specific intent to deceive, ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to the defendant."[16] Patel argues that the definition of intent given to the jury in response to its question removed the government's burden of proving that defendant acted knowingly *and* willfully. However, also within the

---

[15]    *See also United States v. Fields*, 483 F.3d 313, 338 (5th Cir. 2007), *cert. denied* 128 S.Ct. 1065 (2008) (*quoting United States v. Bailey*, 468 F.2d 652, 666 (5th Cir. 1972)) (finding no abuse of discretion in issuing an *Allen* charge and noting that "[t]he charge is used precisely because it works").

[16]    Interestingly, defendant has never raised any objection to the original jury instruction.

Court's response to jury question 3, the Court, consistent with the original jury instructions, unequivocally instructed the jury as follows:

> In order for you to find the defendant guilty of a crime charged in the indictment, you must be convinced, as to that count, that the Government has proved each of the following elements of the crime beyond a reasonable doubt:
>
> First: That the defendant *knowingly and willfully* executed or attempted to execute a scheme or plan to:
>
>> (a) Defraud Medicare and/or private insurance companies, or
>>
>> (b) Obtain money or property from Medicare and/or private insurance companies by means of material, false or fraudulent pretenses, representations, or promises;
>
> Second: That the scheme or plan was executed in connection with the delivery of or payment for health care benefits, items or services;
>
> Third: That the defendant acted with intent to defraud Medicare and/or private insurance companies; and
>
> Fourth: That Medicare and the private insurance companies are health care benefit programs.

(emphasis added).

The cited language, a written copy of which was provided to each juror upon commencement of deliberations, see *supra,* includes the requisite knowingly and willfully language. The Court's response to jury question #3 also included the statement, "If you find that Dr. Patel in good faith believed that the procedures he performed were medically necessary, he cannot be guilty of *willfully* defrauding the

17

health care benefit program, and you must find him not guilty." (emphasis added). "In light of these constant reminders of the Government's burden," and the unobjected to language used in the original charge, the Court's response was not error and does not warrant a new trial. *Heath*, 970 F.2d at 1406.

3.    *The Dismissal of Juror #9*

On the morning of December 19, the Court received a note from Juror #2 alleging that Juror #9 had verbally abused other jurors, refused to review the evidence, refused to deliberate, and had already made up her mind when deliberations began. After discussing the note with counsel and over the objection of defendant, the Court decided that inquiry into the issue was not only appropriate, but necessary.[17]  That afternoon, each juror was individually questioned outside the presence of the other jurors about his or her knowledge of the note, the  contents of the note, and the allegations contained in the note.  Careful not to violate the sanctity of the deliberative process, before the individual questioning began pursuant to agreement by the attorneys for the parties as to the content of the instruction to be given and the questions to be asked, subject to the defendant's objection to any inquiry, the Court instructed each juror as follows:

At the outset, I instruct you that you are not, at anytime during my questioning, to indicate any of the following in any way:

---

[17]    In his Motion for New Trial [Rec. Doc. 280], defendant characterizes the Court's inquiry as ". . . an unconscionable invasion of the secrecy of the jury's deliberations."  However, at all times, the procedure the Court employed after consulting with the attorneys was consistent with Fifth Circuit jurisprudence.

a.    Your view as to whether the government has met its burden of proof beyond a reasonable doubt as to any of the 91 counts in the indictment;

    b.    the view of any of your fellow jurors as to whether the government has met its burden of proof beyond a reasonable doubt as to any of the 91 counts in the indictment;

    c.    how the jury stands numerically on any count of the indictment; or

    d.    your or any of your fellow jurors views as to guilt or innocence.

The members of the jury were then each asked the following questions:

    1.    Are you familiar with the last note the Court received that was signed by [Juror #2]?

    2.    Have you observed any juror state that he or she had made up his or her mind as to what the jury's verdict ought to be when the jury began its deliberations, refuse to look at the evidence, or listen to and consider the opinions of the other jurors, whatever they may be, as to the evidence?

Omitting Juror #9's response, which will be addressed *infra*, question 2 was answered in the affirmative by eight of the eleven remaining jurors all of whom stated that Juror #9 had made the comment. Of the other three remaining jurors, two responded that the comment was not made at the beginning of deliberations, but was made at some point by Juror #9. The final juror responded that he had not heard anyone make such a comment. Juror #9, for her part, denied that she or any other juror had made any such statement or had refused to deliberate. Following the questioning, both the government and defendant were allowed to argue their respective positions and file briefs if they so chose. The Court excused the jury for the weekend and took the

19

matter under advisement.

After research and review of the transcripts of the proceedings and defendant's brief in opposition to Juror #9's dismissal [Rec. Doc. 240], relying on *United States v. Edwards*, *infra*, and the cases cited therein, the Court dismissed Juror #9.[18]  On December 29, in making its decision, the Court found that Juror #9 was not candid with the Court in her responses to the Court's direct questions – in essence she lied; that Juror #9 made a statement at the commencement of deliberations to the effect that she had formed an opinion as to what the jury's verdict ought to be and that regardless of the evidence or opinions of her fellow jurors, her opinion was not going to change; that Juror #9 failed to follow the Court's instructions on a juror's duty to deliberate; and that no prejudice would be suffered by defendant by the removal of Juror #9 as a member of the jury and the seating of the one remaining alternate who had remained segregated from the jury but present in another jury room in the courthouse during the entirety of the jury's deliberations and who had received the same daily admonitions as the jury regarding the case. Patel objected to the Court's ruling and now argues that the dismissal of Juror #9 was reversible error which warrants a new trial.

"District courts have discretion to dismiss jurors for just cause."  *United States v. Edwards*, 303 F.3d 606, 631 (5th Cir. 2002) (*citing United States v. Fryar*, 867 F.2d 850, 853 (5th Cir. 1989)). "A district court abuses its discretion only 'when its ruling is based on an erroneous view of the law or on a clearly erroneous assessment of the

---

[18]     The government chose not to brief the issue and rested on its oral arguments.

evidence.'" *Id. (citing Whitehead v. Food Max of Miss., Inc.*, 277 F.3d 791, 792 (5th Cir. 2002)); *See also United States v. Virgen-Moreno*, 265 F.3d 276, 288 (5th Cir. 2001) ( "Unless the court's removal of the juror has prejudiced the defendant, we will not disturb the court's decision. Moreover, we will find prejudice only if the juror was discharged without factual support or for a legally irrelevant reason."). In this case, the Court was faced with no less than 10 jurors who stated that Juror #9, at least at some point, was not following the Court's instructions and was refusing to deliberate. Patel claims that the real disagreement stemmed from differing views of the evidence and cites in support an email received post-verdict by one of Patel's attorneys from Juror #9 denying the charges leveled against her by the other jurors as reported in the newspapers after the fact. While this Court, as Patel's lawyers, cannot divine what was actually going on in the jury room, the e-mail contains nothing more than what Juror #9 testified to on the stand.[19] The Court has already found the dismissed juror's testimony not to be credible and nothing in Juror #9's email changes that assessment. Accordingly, the Court's dismissal of Juror #9 was appropriate under the circumstances of the case.[20]

---

[19]    Further, for the reasons set out hereinafter, this Court, as any court would be, is much more hesitant, consistent with long standing and controlling jurisprudence, to conduct an inquiry into the verdict and consider evidence post-verdict than it was pre-verdict.

[20]    The Court also notes that defendant can point to no prejudice resulting from this dismissal. Upon the dismissal of Juror #9, an alternate juror who had been instructed with the original jury and given the same instructions at the end of each day with the jury, but segregated in a different jury room during the deliberations, was empaneled and the deliberations began anew. Although defendant characterized the alternate juror as "more amenable" to the government, he cites no basis for this characterization. The Court is also perplexed as to how defense counsel could possibly know how Juror #9 was voting

4.    *Denial of Defense Challenge to Juror #6*

On October 2, 2008, the government called Amanda Dupont as its third witness. The afternoon of the same day, Juror #6 brought to the Court's attention that, although he did not recognize Mrs. Dupont's name during the initial *voir dire*, after seeing and hearing her testify he recognized her.[21]   The Court advised the attorneys of the communication from the juror and, after consulting with the attorneys, questioned the juror at length at sidebar on three separate occasions concerning the nature and extent of his knowledge of and relationship to Mrs. Dupont.   The attorneys and defendant were in the courtroom and able to read the Court's questions and the juror's responses at the counsel tables through the court reporter's realtime transcription of the side bar conferences.    Between each of these conferences, the Court conferred with the attorneys outside of the juror's presence to consider what follow up questions, if any, there need be.   Upon conclusion of the Court's questioning, counsel for defendant moved to dismiss Juror #6 on the basis of the relationship.  The Court orally denied the motion on November 17.  Patel argues that this decision was error warranting a new trial.

As has already been established, the presiding judge has discretion in determining when to excuse a juror.  *Edwards*, 303 F.3d at 631.  In this case, Juror #6

_____

during deliberations prior to her dismissal.  Further, the Court notes that the alternate juror was empaneled as an alternate without objection by either the government or defendant.

[21]    Juror #6 stated that he, at one point, shared a hunting lease with Mrs. Dupont's husband and father-in-law before the father-in-law passed away.  However, he also informed the Court that he had not seen or spoken to Mrs. Dupont in approximately 2 ½ years.

did not deliberately hide his acquaintance with Mrs. Dupont, and, as soon as he realized there was a connection, he brought it to the Court's attention. The Court questioned Juror #6 concerning what, if any, effect his relationship with Mrs. Dupont would have on his ability to be a fair and impartial juror. In response, Juror #6 unequivocally stated that it would have no effect whatsoever and he could continue to be a fair and impartial juror in this case. The Court has, and defendant cites, no basis to dispute the juror's representation. In the face of the juror's unqualified assertion that he could remain fair and impartial, were the Court to hold that this attenuated connection alone was sufficient to challenge a juror – potential or seated – it would create an "impossible standard" for jury selection. *See United States v. Lipscomb*, 299 F.3d 303, 344 (5th Cir. 2002) (*quoting Murphy v. Florida*, 421 U.S. 794, 799-800 (1975)). As this impossible standard has previously been repudiated by the Supreme Court and the Fifth Circuit, the Court finds defendant's challenge to Juror #6 has no basis in fact or in law.

5.    *Introduction of 404(b) Evidence*

Prior to the commencement of trial, the Court partially granted defendant's motion to exclude reference to procedures not contained in the indictment.[22] During his opening argument, counsel for defendant made reference to the number of

---

[22]    Specifically, the Court granted defendant's motion insofar as it related to all procedures not contained in the indictment which were performed prior to the execution of the search warrant. The Court denied the motion insofar as it pertained to post-search warrant procedures finding that those procedures' probative value outweighed their prejudicial effect. *Order* [Rec. Doc. 89].

procedures preformed per year  by Patel in comparison to the number of charges

brought by the government.  Further, during cross examination, defense counsel asked

several of the government witnesses how many of Patel's files they reviewed and how

many of those files were contained in the indictment.  Based on the actions of the

defense counsel, the government, on October 20,  sought permission to refer to the

previously excluded evidence.  Finding that defendant had "opened the door" to the

evidence by insinuating that the other procedures reviewed were deemed "medically

necessary" by the witness, the Court granted the government's request but limited its

use solely to rebutting the inference created by defendant.[23]  Defendant denies that he

"opened the door" to the evidence and argues that its admission was reversible error

warranting a new trial.

"If a defendant injects otherwise inadmissible evidence, the defense cannot later

object to such invited error." *United States v. Acosta*, 475 F.3d 677, 683 (5th Cir.2007).

The Fifth Circuit has held that cross-examination that creates an incorrect inference

opens the door for the government to introduce testimony that would otherwise be

inadmissible to rebut defendant's "insinuations."  *United States v. Whittington,* 269

Fed.Appx. 388, 408-409 (5th Cir. 2008) (*citing Acosta*, 475 F.3d at 684-85).  In his

opening statement and in his cross examination, defense counsel made a tactical

decision to allude to the number of procedures charged in the indictment in such a way

_____

[23]    The Court allowed the government only to question the witnesses about the number of
procedures reviewed versus the number of procedures found "medically unnecessary" by
the witness.  The parties were not allowed to reference particular procedures or to name
patients not named in the indictment which had been previously excluded.

24

as to create an incorrect inference that many of the reviewed procedures were deemed "medically necessary" by the government's experts. That Patel ". . . had yet to put on a witness or present any witnesses," is of absolutely no consequence as the "invited error" was attributable solely to the actions of defendant through his counsel. If there was an error, it was invited, and the Court correctly allowed the government to rebut defendant's incorrect insinuations.

6.      *Improper Cross-Examination by the Government*

On December 9 during direct examination, defense counsel asked defendant whether certain government witnesses had participated in civil lawsuits against defendant. Before defendant answered counsel's question, the government objected and requested a bench conference. At the bench conference, the Assistant United States Attorney argued that, should defense counsel continue his line of questioning regarding the civil suits, the government intended to cross-examine the defendant regarding the full breadth of the suits filed. The Court advised counsel that, based on the arguments adduced to that point, it agreed with the government's position. However, as the matter was not immediately pressing since defendant was still on direct, the Court suggested that the matter be fully taken up at the end of the day. Despite the warnings by the government and the cautions by the Court, defense counsel continued his line of questioning regarding not only the pending civil suits brought by those certain government witnesses, but also the status of those matters.

On cross-examination, the government asked Patel whether other individuals not

named in the indictment had also filed civil suits against him and the status of those suits. Over defendant's objection, finding that by asking about the civil lawsuits on direct examination defendant had opened the door to the evidence, the Court allowed the government to ask Patel solely about his knowledge as to how many civil claims were brought against him and whether, to his knowledge, those claims had been resolved.[24] The government was not allowed to ask about any other details concerning the civil suits. Defendant argues that the Court erred in allowing the government to question Patel about the civil cases thus warranting a new trial.

As discussed, *supra*, "[i]f a defendant injects otherwise inadmissible evidence, the defense cannot later object to such invited error." *Acosta*, 475 F.3d at 683. It is nonsensical to argue that defense counsel may permissibly question a witness about a subject but the government may not. In *United States v. Rutgard*, 116 F.3d 1270 (9th Cir. 1997), the United States Court of Appeals for the Ninth Circuit was presented with a similar situation. There, the defendant, an ophthalmologist, argued that the trial court committed reversible error by ruling that four "key" government witnesses could not be cross-examined by the defendant regarding certain civil suits unless the government also had the opportunity to bring out the details of those suits. In affirming the trial court's ruling, the Ninth Circuit stated "[t]o have permitted cross-examination to develop a hostile motive to testify against [defendant] would have given only half the picture[.

---

[24] The Court instructed counsel to use the word "resolved" as opposed to "settled" to avoid any inadvertent comment on the merits of the underlying civil suits. Patel was not a party to any of the settlements reached and testified as such during direct examination.

. . .] The court was entitled to use its discretion in ruling how much of the relevant circumstances could be brought out by the government to rehabilitate its witnesses." *Rutgard,* 116 F.3d at 1279 (*citing United States v. Shapiro*, 879 F.2d 468, 472-73 (9th Cir. 1989)). The same is true under the facts of this case. Defendant admits that he chose to inject the information concerning the civil suits to ". . . show possible bias and prejudice on the part of the patients who testified during the Government's case."

Further, under Federal Rule of Evidence 408, the existence of the civil suits was not introduced for an improper purpose, *i.e.* ". . . to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction." F.R.E. 408(a). Instead, the questioning was allowed to rebut the inference created by defendant regarding certain witnesses' credibility. Rule 408(b) allows such evidence so long as it is consistent with Rules 402 and 404(b) and is used for purposes not prohibited by Rule 408(a). F.R.E. 408(b). Allowing the government to cross examine the defendant concerning the civil lawsuits was proper under the facts of the case and the controlling jurisprudence.

7.     *Introduction of Inadmissible Evidence by the Government*

Defendant asserts that the Court erred by allowing the government to introduce a summary chart of defendant's total income into evidence. From a review of the realtime transcripts and the exhibits actually introduced into evidence, the Court has not been able to establish that the summary chart complained of was actually introduced into evidence nor has the defendant directed the Court to when that was

done. Summary charts were, however, permissibly employed by the government. Specifically, Agent Barbara Allemand, the government's case agent, referenced a chart summarizing the total amount of defendant's income during the years Patel executed the charged scheme. Defendant objected to the witness's reference to the chart, and, after providing the attorneys for the parties an opportunity to argue their positions at sidebar, on November 3, the Court ruled that pursuant to Federal Rule of Evidence 611 and 403 and the applicable jurisprudence, the chart could be used as a demonstrative aid. The Court presumes that it is this ruling to which the defendant objects.

In a recently decided case, the Fifth Circuit stated

"[A]llowing the use of charts as 'pedagogical' devices intended to present *the government's version of the case* is within the bounds of the trial court's discretion to control the presentation of evidence under [Federal Rule of Evidence] 611(a)." [*United States v. Harms*, 442 F.3d 367, 375 (5th Cir. 2006)] (quotation omitted and emphasis added). "[S]uch charts are not admitted into evidence and should not go to the jury room absent consent of the parties." *Id.* (quotation omitted). "If a summary or chart is introduced solely as a pedagogical device, the court should instruct the jury that the chart or summary is not to be considered as evidence, but only as an aid in evaluating evidence." *Id.* (citation omitted).

*United States v. Ollison*, 555 F.3d 152, 162 (5th Cir. 2009)

In this case, as in *Ollison*, the Court did not allow the government to introduce the chart as evidence but merely allowed the chart to be used a demonstrative aid. Further, during the final jury instructions, the Court instructed the jury that

Certain charts and summaries have been shown to you solely to help explain the facts disclosed by the books, records, and other documents which are in evidence in the case. These charts and summaries are not evidence or proof of any facts. You should determine the facts from the

evidence.

As to the underlying information contained in the chart, the Court ruled that, in proving a scheme or artifice to defraud Medicare, the probative value of the evidence concerning defendant's total income outweighed its prejudicial effect pursuant to Rule 403. Additionally, defendant failed to offer any objection to the government's exhibits 500-672, which were the checks paid to Patel by Acadiana Cardiology representing the payment and the amount shown on the presumed chart in question. There was, then, no error in allowing the use of the charts or presenting the information contained therein.

Defendant also argues that the Court erred in allowing the government to adduce testimony from a medical ethicist. The Supreme Court has ". . . allowed juries to assess the prevailing standards of care among medical professionals in cases involving the criminal prosecution of licensed practitioners." *United States v. Feingold*, 454 F.3d 1001, 1007 (9th Cir. 2006) (*citing United States v. Moore*, 423 U.S. 122, 126 (1975)) ("Knowing how doctors generally ought to act is essential for a jury to determine whether a practitioner has acted not as a doctor, or even as a *bad* doctor, but [ . . . ] without a legitimate medical justification."). "To be sure, an *undue* emphasis on standard-of-care evidence might, in certain circumstances, confuse a jury." *United States v. Alerre*, 430 F.3d 681, 691 n. 10 (4th Cir. 2005) *(emphasis added).* In this case, the presentation of the medical ethicist was not an undue emphasis on the standard of care and was completely relevant to the inquiry of whether Patel believed

his actions were "medically necessary." Thus, the probative value of the witness's testimony setting forth the standard of care generally applicable to doctors outweighed the *de minimus,* if any, prejudicial effect it may have had on defendant. Accordingly, the testimony was proper under the law and facts of the case.

8.     *Denial of Requested Jury Instructions*

Patel argues that the Court erred in denying his request for two jury instructions. District courts enjoy substantial latitude in formulating jury instructions. *United States v. Porter*, 542 F.3d 1088, 1093 (5th Cir. 2008) (*citing United States v. Jobe*, 101 F.3d 1046, 1059 (5th Cir. 1996)). The district court abuses this discretion only if it denies an instruction which (1) is a substantively correct statement of the law, (2) is not substantially covered in the charge as a whole, and (3) concerned an important point in the trial such that the failure to instruct the jury on the issue seriously impaired defendant's ability to present a given defense. *Id.*

The first charge requested by Patel concerned certain government witnesses' participation in civil suits against Patel. Specifically, Patel requested that the jury be instructed that:

> The indictment charges that Dr. Patel executed a scheme to defraud health care benefit programs by performing medically unnecessary procedures. As part of its evidence, the Government presented the testimony of a number of Dr. Patel's former patients. Many of those Government witnesses are also plaintiffs in civil suits against Dr. Patel. The civil suits are based on the same allegations as this criminal prosecution, that is, they claim that Dr. Patel performed medically unnecessary procedures. The plaintiffs in the civil suits are seeking money damages. The law allows you to consider evidence of the civil

proceedings in evaluating the possible bias or prejudice of a witness.

Patel argues that this instruction was substantially correct, was not covered by any other requested or pattern instruction, and concerned crucial points such that the failure to give the instruction seriously impaired Patel's ability to present his defense. However, a review of the charge reveals that it is not substantially correct and the parts which are correct are covered by the charge as a whole.

Patel's requested charge states that the civil suits, "are based on the same allegations as this criminal prosecution, that is, they claim that Dr. Patel performed medically unnecessary procedures." This statement is not substantially correct as the criminal prosecution involved more than merely proving that the procedures in question were not medically necessary. The government was also required to prove, beyond a reasonable doubt, that defendant performed the medically unnecessary procedures in order to defraud health care benefit programs. Secondly, the matter of the credibility of the witnesses is covered by Fifth Circuit Pattern Jury Instruction 1.08 which was given to this jury and which states:

> I remind you that it is your job to decide whether the government has proved the guilt of the defendant beyond a reasonable doubt. In doing so, you must consider all of the evidence. This does not mean, however, that you must accept all of the evidence as true or accurate.
>
> You are the sole judges of the credibility or "believability" of each witness and the weight to be given the witness's testimony. An important part of your job will be making judgments about the testimony of the witnesses including the defendant who testified in this case. You should decide whether you believe all or any part of what each person had to say, and how important that testimony was. In making that decision I suggest that

you ask yourself a few questions: *Did the person impress you as honest? Did the witness have any particular reason not to tell the truth? Did the witness have a personal interest in the outcome of the case? Did the witness have any relationship with either the government or the defense?* Did the witness seem to have a good memory? Did the witness clearly see or hear the things about which he testified? Did the witness have the opportunity and ability to understand the questions clearly and answer them directly? Did the witness's testimony differ from the testimony of other witnesses? These are a few of the considerations that will help you determine the accuracy of what each witness said.

The testimony of the defendant should be weighed and his credibility evaluated in the same way as that of any other witness.

Your job is to think about the testimony of each witness you have heard and decide how much you believe of what each witness had to say. In making up your mind and reaching a verdict, do not make any decisions simply because there were more witnesses on one side than on the other. Do not reach a conclusion on a particular point just because there were more witnesses testifying for one side on that point.

(emphasis added)

The pattern instruction instructed the jurors to ask themselves the questions set out regarding personal interests in the outcome of the case and reasons not to tell the truth, which would certainly include any pending civil suits and claims for money damages against the defendant. As the defendant's requested charge was not substantially correct and was otherwise covered by the general instructions, there was no error in denying defendant's requested charge.

Patel also requested a jury instruction regarding the role of the treating physician. Specifically, he requested that the jury be instructed:

You have heard testimony from Dr. Patel, as well as from a number of doctors who testified for the Government as expert witnesses. The

opinion of a treating physician who is familiar with the patient's impairments, treatments, and responses should be accorded great weight. The testimony of a treating physician is generally given more weight than that of non-examining doctors, because a treating physician is likely to be the medical professional most able to provide a detailed, long-range picture of the patient's medical condition. Factors you may consider in assessing the weight to be given testimony of the treating physician include:

(1)    the physician's length of treatment of the patient;

(2)    the physician's frequency of examination;

(3)    the nature and extent of the treatment relationship;

(4)    the support of the physician's opinion afforded by the medical evidence of record;

(5)    the consistency of the opinion with the record as a whole; and

(6)    the specialization of the treating physician.

Patel argues that this instruction is legally correct as it was adopted from language in *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000), and 20 C.F.R. §404.1527(d)(2). However, this charge is directly contradictory to the general instructions given to the jury which state, "The testimony of the defendant *should be weighed and his credibility evaluated in the same way as that of any other witness.*" (emphasis added). Further, both the case and the regulation cited by defendant in support of this instruction concern Social Security proceedings – not criminal jury trials. Defendant points to absolutely no statutory or jurisprudential authority to support his proposition that this instruction is proper in a criminal trial. The requested charge is not substantially correct

in the context of this criminal case as it contradicts the general jury instruction that the defendant's testimony is judged by the same standard as any other witnesses' testimony. There was no error in denying defendant's requested charge.

9.     *Denial of the Transfer of Venue*

Patel argues the Court erred in denying his Motion to Transfer Venue [Rec. Docs. 166]. In his Motion for New Trial [Rec. Doc. 280], defendant merely relies on the arguments contained in his prior motion. For the reasons stated in the Court's Memorandum Ruling on the issue [Rec. Doc. 243], the defendant was not entitled to a change of venue based on the applicable law or facts of the case.

10.     *Denial of the Motion to Suppress*

Patel argues the Court erred in failing to grant his Motion to Suppress [Rec. Doc. 96]. As defendant, again, raises nothing new on this issue in his post-trial motions and for the reasons given by the Magistrate Judge in her Report and Recommendation [Rec. Doc. 131], as adopted by the District Court [Rec. Doc. 138], there was no error.

11.     *Verdict is against the Weight of the Evidence*

Patel argues that the verdict was against the weight of the evidence presented. For the oral reasons stated in denying defendant's Motion for Acquittal [Rec. Doc. 207] on November 4 as well and for the reasons set out in subsection (B), *infra*, the verdict was not against the weight of the evidence.

12.     *Cumulative Effect of the Alleged Errors*

While the Court is confident that its rulings were correct on the facts of the case

and the applicable law, it is important to remember that ". . . given the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and [ . . . ] the Constitution does not guarantee such a trial." *United States v. Lane*, 474 U.S. 438, 446 (1986) (*quoting United States v. Hasting*, 461 U.S. 499, 508-09 (1983)); *See also Brown v. United States*, 411 U.S. 223, 222-23 (1973) ( "'[A] defendant is entitled to a fair trial but not a perfect one,' for there are no perfect trials") (*quoting Bruton v. United States,* 391 U.S. 123, 135 (1968); and *Lutwak v. United States,* 344 U.S. 604, 619 (1953)).  The Court is convinced that Patel received a fair trial, and, if errors were made, they were harmless and do not, collectively nor individually, rise to the level of reversible error.

B.      *Defendant's Motion for Acquittal*

At the close of the government's case, defendant filed a Motion for Acquittal [Rec. Doc. 207].  After considering the parties' briefs and oral arguments, the Court orally denied defendant's motion on November 4.  Patel now renews his motion and argues that no rational juror could have found that the government had carried its burden of proving defendant guilty beyond a reasonable doubt of the crimes of conviction.

The standard for evaluating a defendant's motion for acquittal is whether " . . . after viewing the evidence in the light most favorable to the prosecution, any reasonable trier of fact could have found the essential elements of the crime beyond

a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307 (1979).  The evidence need not exclude every reasonable hypothesis of innocence nor be wholly inconsistent with every conclusion except that of guilt.  *United States v. Guanespen-Portillo*, 514 F.3d 393 (5th Cir. 2008).  In making its determination, the Court cannot consider the credibility of the witnesses nor the weight of the evidence.  *United States v. Myers*, 104 F.3d 76 (5th Cir. 1997); *United States v. Guidry*, 406 F.3d 314 (5th Cir. 2005).  Applying this standard and viewing the evidence as a whole in the light most favorable to the government, the Court will deny defendant's motion yet again as the Court finds that the record before the jury contained sufficient evidence as to each count of the conviction to support the jury's verdict.[25]

C.    *Defendant's Motion for Order in Arrest of Judgment*

In his Motion for Order in Arrest of Judgment [Rec. Doc. 282], Patel argues that the indictment does not properly charge the offense of health care fraud.  This is the same argument advanced by Patel in his Motion to Dismiss [Rec. Doc. 95] filed before the commencement of trial.  For the reasons stated in the Magistrate Judge's Report and Recommendations on defendant's Motion to Dismiss [Rec. Doc. 130], as adopted by the District Court [Rec. Doc. 138], there was no error in the Court's original ruling and defendant's motion will be denied.

---

[25]    The Court notes that the government called at least 80 witnesses including 10 medical doctors specializing in various fields including invasive and diagnostic cardiology, internal medicine, medical ethics, and others.  Also called were several other medical professionals, including nurses and defendant's former physician's assistant, who had actually worked with Patel in the cauterization lab, as well as some of the patients whose procedures were charged in the indictment.

D.    _Defendant's Motions to Conduct Post-Trial Juror Interviews_

As is custom in this district, the Court instructed the attorneys and parties to have no contact with the jurors after the conclusion of trial.   Patel, however, seeks the Court's permission to conduct post-trial juror interviews.   This request is based on certain statements made to the Court by Juror #9 upon her dismissal on December 22 and after the conclusion of trial in an email to defense counsel.[26] More than a century ago, courts recognized ". . . the near-universal and firmly established common-law rule [ . . . which] flatly prohibited the admission of juror testimony to impeach a jury verdict." _Tanner v. United States_, 483 U.S. 107, 117 (1987) (_citing_ 8 J. Wigmore, Evidence § 2352, pp. 696-697 (J. McNaughton rev. ed. 1961) (common-law rule, originating from 1785 opinion of Lord Mansfield, "came to receive in the United States an adherence almost unquestioned")).   More recently, the adoption Federal Rule of Evidence 606(b) codified this "near-universal" rule.   F.R.E. 606(b).   In the comments to Rule 606, the drafters explained:

> Public policy requires a finality to litigation. And common fairness requires
> that absolute privacy be preserved for jurors to engage in the full and free

---

[26]    Juror #9's December 22nd statement to the Court was relayed to the attorneys for the parties on the record at sidebar immediately after the Court dismissed her.  Specifically, the Court recounted its conversation with Juror #9 by stating, "I thanked her for her service and shook her hand and then told her that she would be paid for today and she said that's not a big deal, I said I know, that she but Judge [_sic_] I want to tell you you've got some problems in that jury room and I said, [Juror #9], I can't talk to you about that." Patel points to the statement regarding "problems" in the jury room and an e-mail message from Juror #9 sent to defense counsel after the rendition of the verdict stating, in pertinent part, "In my opinion, what prompted the juror to write the note was our basic differences of opinion while evaluating the evidence during deliberations.  There were many disagreements over the interpretation of the evidence," and otherwise denying the allegations made against her in the hearing conducted by the Court as reported after the fact in the newspaper.

debate necessary to the attainment of just verdicts. Jurors will not be able to function effectively if their deliberations are to be scrutinized in post-trial litigation. In the interest of protecting the jury system and the citizens who make it work, *rule 606 should not permit any inquiry into the internal deliberations of the jurors.*

Cmt. to Rule 606(b) (emphasis added).

*See also McDonald v. Pless*, 238 U.S. 264, 267 (1914) ("[L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation – to the destruction of all frankness and freedom of discussion and conference.").

Based on the clear wording and public policy giving rise to Rule 606, it is unclear for what purpose defendant seeks to conduct these interviews other than to engage in the proverbial "fishing expedition." While Patel correctly states that the exception to the general rule concerns testimony on matters external to the deliberations, he cites absolutely no evidence of any such influence and the record is devoid of any such

evidence.[27]   While courts have struggled to define what constitutes an "external" influence warranting the admission of juror testimony, it is beyond question that the jury's mental processes and the effect of anything upon a juror's mind as influencing him to assent to or dissent from a verdict are matters which are *internal* to the deliberations and not subject to post-trial scrutiny.   *See Tanner*, 483 U.S. at 127 (holding that it was not error for the trial judge to exclude testimony and affidavits from jurors who sought to testify regarding other jurors' use of alcohol, marijuana, and cocaine during deliberations); *See also United States v. Martinez-Moncivais*, 14 F.3d 1030, 1036 (5th Cir. 1994) (refusing to consider a post-verdict affidavit from a juror stating that two other jurors suggested that if defendant had been innocent he would have taken the stand in his own defense); *United States v. Allen*, 588 F.2d 1100, 1106, n.12 (5th Cir. 1979) (noting "specific reluctance to probe the minds of jurors once they have deliberated their verdict");  *United States v. Dioguardi*, 492 F.2d 70 (2nd Cir. 1974) (holding that a letter from a juror stating that she had "eyes and ears that . . . see things before [they] happen," and that ". . . a curse was put upon them some years ago" was not admissible to prove that juror was incompetent during deliberations as it spoke to the juror's mental process); *and Sullivan v. Fogg*, 613 F.2d 465, 467 (2nd Cir. 1980) (allegation of juror insanity is internal consideration).   To suggest here that, "basic

---

[27]   At least one opinion has expressed doubt as to whether the "external influence" common-law exception was actually retained by Rule 606.  *See United States v. Webster*, 960 F.2d 1301, 1306 n.1 (5th Cir. 1992) ( "In fact, *Tanner* did not reach the question of whether such exceptions actually exist.  Instead, the Court merely assumed that the Rule left open the possibility that it had incorporated the common law exception.  Since the exception was inapplicable in the *Tanner* case, the Court did not conclusively decide the question.").

differences of opinion while evaluating the evidence during deliberations" is anything but an internal matter teeters on the edge of incredibility.  As this is the only definitive statement concerning the "problems" in the jury room referenced by Juror #9, the Court will not allow defendant to engage in a fishing expedition in hopes of finding some hypothetical or metaphysical error. *See Tanner*, 483 U.S. at 120 ("The Court's statement in *Remmer* [*v. United States,* 347 U.S. 227, 229 (1954),] that 'the integrity of jury proceedings must not be jeopardized by unauthorized invasions,' [. . .] could also be applied to the inquiry petitioners seek to make into the internal processes of the jury. [ . . . ] There is little doubt that post verdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior.  It is not at all clear, however, that the jury system would survive such efforts to perfect it.").[28]  Accordingly, defendant's request to interview the jurors will be denied.

This decision is entirely consistent with the Court's decision to conduct a hearing into Juror #2's note to the Court during deliberations.  In affirming the denial of a request similar to the one in this case,  the United States Supreme Court stated that ". . . jurors are observable to each other, and may report inappropriate behavior to the court *before* they render a verdict."  *Tanner*, 483 U.S. at 127 (*citing Lee v. United States*, 454 A.2d 770 (DC App. 1982), *and McIlwain v. United States,* 464 U.S. 972

_____

[28]     It also telling that, in her email to defense counsel, Juror #9 states that the statements made therein are only her *opinion* and cites nothing to support those statements.

(1983) (denying certiorari in case involving jury foreman who was incapacitated by inebriation on second day of deliberations)).[29]  Requiring that internal problems arising during deliberations be dealt with during deliberations, as opposed to after the verdict has been reached, best achieves the dual competing objectives of (1) ensuring that the jury returns a legally sound verdict and (2) finality of the verdict once reached.

Further, were the Court to allow post-trial investigations of internal considerations, such investigations would, no doubt, lack reliability.   This proposition has been endorsed by the Fifth Circuit in *United States v. Jones*, 132 F.3d 232 (5th Cir. 1998), a death penalty case, wherein the Court noted:

> Jury deliberations entail delicate negotiations where majority jurors try to sway dissenting jurors in order to reach certain verdicts or sentences.  An individual juror no longer exposed to the dynamic offered by jury deliberations often may question his vote once the jury has been dismissed.  Such self-doubt would be expected once the extrinsic influences bear down on former jurors[.]

> *Jones*, 132 F.3d at 246.

As a result, the Fifth Circuit was ". . .  convinced that Rule 606(b) does not harm but helps guarantee the reliability of jury determinations[.]" *Id.* (holding that Rule 606 barred post-verdict testimony and affidavits of jurors in a death penalty case regarding alleged confusion caused by the instructions). Conversely, by addressing the problems as they occur, any appropriate investigation will necessarily be more fruitful as the memories of those involved will be fresher than after the jury has been dismissed.  The Court will

---

[29]     Juror #2's note is evidence that the jurors in this case were well aware of their ability to inform the Court of any issues which may have arisen during the deliberations.

therefore deny defendant's request to conduct post-verdict interviews of the jurors as it is contrary to long standing and well established jurisprudence.  The Court will also deny defendant's request for a hearing on the issue.

E.    _Government's Motion for Preliminary Order of Forfeiture_

In the indictment, in addition to charging defendant with health care fraud, the government also alleged one count of Criminal Forfeiture pursuant to 18 U.S.C. § 982(a)(7).  As defendant has been found guilty of 51 counts of the indictment, the government now moves, pursuant to Federal Rule of Criminal Procedure 32.2(b), for a preliminary order of forfeiture of all property derived from the health care fraud violations charged in the indictment.  Having resolved defendant's post-trial motions, the Court will now turn to the propriety of the government's request for a preliminary order of forfeiture.  Section 982 of Title 18 of the United States Code states that, "[t]he court, in imposing sentence on a person convicted of a Federal health care offense, _shall_ order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense." 18 U.S.C. §982(a)(7) (emphasis added).  The mandatory language of this statute leaves the Court absolutely no discretion in imposing this portion of the sentence.

Federal Rule of Criminal Procedure 32.2 outlines the procedure the Court must follow in entering a judgment of criminal forfeiture.   Pursuant to subsection (a) of that rule, the government properly notified defendant via the indictment that it intended to pursue a forfeiture judgment if defendant was found guilty of the crimes charged.  _See_

*Indictment* [Rec. Doc. 1], pg. 24.  In this case, the government seeks a personal money judgment from defendant.  Thus, the Court, based on the evidence in the record, must determine the amount of money that defendant will be ordered to pay. Fed. R. Cr. P. 32.2(b)(1).  Once the determination of the amount of property subject to forfeiture is made, the Court is required to ". . . promptly enter a preliminary order of forfeiture setting forth the amount of [. . . the] money judgment." Fed. R. Cr. P. 32.2(b)(2).  Here, the government alleges that it is entitled to a forfeiture judgment in the amount of $48,231.39.

While Patel does not dispute the amount subject to forfeiture, he contests the Court's ability to enter a "personal money judgment" against him arguing that forfeiture proceedings are *in rem*, as opposed to *in personam*, actions, and, accordingly, a "personal money judgment" is not authorized.  In support of this contention, Patel cites *United States v. Croce*, 334 F.Supp.2d 781 (E.D.Penn 2004) and *United States v. Day*, 416 F.Supp.2d 79 (D.D.C. 2006).   However, as defendant readily concedes, the analysis on which he relies was squarely rejected by the appellate courts considering those cases.  *See United States v. Day*, 524 F.3d 1361 (D.C. Cir.), *cert. denied* 129 S.Ct. 295 (2008) ("[T]he District Court erred in denying the Government's request for a money judgment [. . . as n]othing in the relevant statutes suggests that money judgments are *forbidden*. Rather, 'the open-ended nature of an order forfeiting the proceeds of an offense is implicit in both the mandatory nature of forfeiture and in the procedures Congress created for locating the forfeitable property itself, or for satisfying

the forfeiture judgment with substitute assets.'"), *and United States v. Croce*, 209 Fed.Appx. 208 (3rd Cir. 2006)("[The] statutory scheme does not restrict the District Court from issuing a forfeiture order in the full amount of the illegal proceeds, even where the full amount is not presently in the defendant's possession"); *See also United States v. Vampire Nation*, 451 F.3d 189 (3rd Cir. 2006) (holding that a forfeiture order may take the form of a judgment for a specific sum of money equal to the proceeds of the offense); *United States v. Conner*, 752 F.2d 566 (11th Cir. 1985) (recognizing that Congress "revised the concept of forfeiture" in making forfeiture part of the criminal penalty against the individual); *United States v. Casey*, 444 F.3d 1071 (9th Cir. 2006); *United States v. Hall*, 434 F.3d 42 (1st Cir. 2006) ("[T]he government need not prove that the defendant actually has the forfeited proceeds in his possession at the time of convictions").  Having considered the applicable jurisprudence, this Court finds that a "personal money judgment," as contemplated by Fed. R. Cr. P. 32.2, is permitted by the forfeiture statutes and defendant's arguments to the contrary must be rejected.

As defendant does not contest the amount subject to the forfeiture, in accordance with the mandatory language of §982, the Court will grant the government's Motion for Preliminary Order of Forfeiture [Rec. Doc. 278] pursuant to Fed. R. Cr. P. 32.2 and enter a preliminary judgment ordering defendant to forfeit $48,231.39 to the United States.

## III.  CONCLUSION

Defendant's able attorneys' garrulous arguments and assertions to the contrary notwithstanding, Patel received a trial consistent with the Constitution and laws of the United States of America and was afforded all of the safeguards provided thereby to a defendant in a criminal trial.  Accordingly, defendant's post-trial motions [Rec. Docs. 280, 281, 282, 283, 285, 286, and 288] will be **DENIED**.  Further, as the Court finds no merit in defendant's contention that the forfeiture statutes do not permit a personal money judgment and as defendant does not object to the amount advanced by the government, the Court will **GRANT** the government's Motion for Preliminary Order of Forfeiture [Rec. Doc. 278] in the sum of $48,231.39.